IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| TEKNIK ALUMINYUM SANAYI A.S.,      Plaintiff, <br><br> v. <br><br> UNITED STATES,      Defendant, <br><br> and <br><br> ALERIS ROLLED PRODUCTS, INC. et al.,      Intervenor Defendant. | Court No. 21-00251 <br><br> PUBLIC VERSION <br><br> Business Proprietary Information Denoted by Brackets [ ] on Page(s) 37, 48 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney
General


PATRICIA M. MCCARTHY
Director


REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

BRENDAN SASLOW
Senior Attorney
Office of the Chief Counsel
    for Trade Enforcement and
    Compliance
U.S. Department of Commerce
Washington, D.C.

KYLE S. BECKRICH
Trial Attorney
U.S. Dept. of Justice
Civil Division/National Courts
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9322
Fax: (202) 616-9322
E-mail: kyle.beckrich@usdoj.gov

January 21, 2022

Attorneys for Defendant

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

STATEMENT PURSUANT TO RULE 56.2.......................................... 2

    I.    The Administrative Determination Under Review.............. 2

    II.   Issues Presented For Review.................................................. 2

STATEMENT OF FACTS.................................................................... 3

SUMMARY OF ARGUMENT.............................................................. 12

ARGUMENT.......................................................................................14

    I.    Standard Of Review...............................................................14

    II.   Because Commerce Could Not Verify Teknik's Benefit And Non-Use Of Alleged Subsidy Programs, Commerce's Reliance On AFA Is Supported By Substantial Evidence And In Accordance With Law ........................................................16

        A.   Commerce's Application Of Its Modified Verification Procedures Is Supported By Substantial Evidence And In Accordance With Law........................................... 16

           1.   Commerce Modified Its Verification Procedures Due To The Covid-19 Pandemic......................... 16

           2.   Commerce Properly Applied Its Procedures To Teknik's Submissions ........................................ 22

           3.   Commerce Was Not Required To Issue A Verification Report............................................. 25

        B.   Commerce's Reliance On Facts Available With An Adverse Inference Because Teknik Failed To Provide Requested Verification Screenshots Is Supported By Substantial Evidence And In Accordance With Law.. 28

i

1.  Teknik's Failure To Provide The Information
     Requested By Commerce Should Not Be
     Excused .............................................................. 29

2.  Teknik Chose To Submit Noncompliant
     Submissions ....................................................... 32

3.  Commerce's Decision To Rely On An Adverse
     Inference Is Supported By Substantial Evidence
     And In Accordance With Law ............................. 40

4.  Commerce's Decision To Reject Teknik's Sales
     Reconciliation Is Supported By Substantial
     Evidence And In Accordance With Law ........... 50

CONCLUSION ........................................................................ 53

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Acciai Speciali Terni S.P.A. v. United States,*
  142 F. Supp. 2d 969 (Ct. Int'l Trade 2001) .............................. 33, 36, 37

*Am. Alloys v. United States,*
  30 F.3d 1469 (Fed. Cir. 1994) ............................................................ 18

*Atl. Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) ......................................................... 14

*Boomerang Tube LLC v. United States,*
  856 F.3d 908 (Fed. Cir. 2017) ............................................................ 25

*Ceramica Regiomontana, S.A. v. United States,*
  810 F.2d 1137 (Fed. Cir. 1987) ......................................................... 16

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ............................................................................. 14

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ............................................................................. 14

*Corus Staal BV v. United States,*
  502 F.3d 1370 (Fed. Cir. 2007) .................................................... 25, 26

*Dorbest Ltd. v. United States,*
  604 F.3d 1363 (Fed. Cir. 2010) ......................................................... 26

*Essar Steel, Ltd. v. United States,*
  753 F.3d 1368 (Fed. Cir. 2014) ........................................................... 8

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ........................................................... 14

*Goldlink Indus. Co. v. United States,*
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ..................................... 15

*Guizhou Tyre Co. v. United States,*
  523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ..................................... 23

*Guizhou Tyre Co. v. United States*,
    415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019).................................passim

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    992 F.3d 1348 (Fed. Cir. 2021)...............................................8, 9, 10, 11

*Hercules, Inc. v. United States*,
    673 F. Supp. 454 (Ct. Int'l Trade 1987).............................................. 18

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020)...........................30, 31, 32

*Hyundai Steel Co. v. United States*,
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018).................................... 50

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ........................................................................... 15

*Itochu Bldg. Prods. v. United States*,
    733 F.3d 1140 (Fed. Cir. 2013) ......................................................... 26

*Koyo Seiko Co. v. United States*,
    682 F. Supp. 1108 (Ct. Int'l Trade 1990)........................................ 39

*Luoyang Bearing Factory v. United States*,
    240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002).................................... 26

*Micron Tech. v. United States*,
    117 F.3d 1386 (Fed. Cir. 1997) ......................................................... 17

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 ..............................................................................51, 52

*Neenah Foundry Co. v. United States*,
    142 F. Supp. 2d 1008 (Ct. Int'l Trade 2001)................................... 39

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)....................................................40, 41

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009)................................... 15

*PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2021)............................................................. 17

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011)........................................................... 24

*Shandong Huarong Gen. Corp. v. United States*,
   159 F. Supp. 2d 714 (Ct. Int'l Trade 2001)......................................... 15

*Shandong Huarong Mach. Co. v. United States*,
   29 C.I.T. 484 (2005)........................................................................... 51

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) ....................................................17, 18, 27

*Tianjin Mach. Imp & Exp. Corp. v. United States*,
   353 F. Supp. 2d 1294 (Ct Int'l Trade 2004)..............................18, 33, 41

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995)..........................................................18, 19

*Wheatland Tube Co. v. United States*,
   161 F.3d 1365 (Fed. Cir. 1998)........................................................... 15

*Yama Ribbons & Bows Co. v. United States*,
   865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012)....................................... 51

## Statutes

19 U.S.C. § 1677.............................................................................4, 5

19 U.S.C. § 1677e........................................................................passim

19 U.S.C. § 1677m.......................................................................passim

28 U.S.C. § 2637............................................................................. 25

## Regulations

19 C.F.R. § 351.301............................................................................ 31

19 C.F.R. § 351.307................................................................19, 20, 25, 27

19 C.F.R. § 351.524................................................................................. 5

## Administrative Determinations

*Brake Rotors from the People's Republic of China*, 64 Fed. Reg. 61,581
   (Dep't of Commerce Nov. 12, 1999) ..................................................... 19

*Common Alloy Aluminum Sheet from Turkey*, 85 Fed. Reg. 49,629
   (Dep't of Commerce August 14, 2020) (prelim. determ.)..................4, 12

*Common Alloy Aluminum Sheet from Turkey*, 86 Fed. Reg. 13,315
   (Dep't of Commerce Mar. 8, 2021) (final determ.)........................passim

*Frozen Warmwater Shrimp from China*, 78 Fed. Reg. 50,391 (Dep't of
   Commerce Aug. 19, 2013)....................................................................... 8

*Pasta from Turkey*, 81 Fed. Reg. 52,825 (Dep't of Commerce Aug. 10,
   2016) (prelim. results)........................................................................... 11

*Pasta from Turkey*, 81 Fed. Reg. 90,775 (Dep't of Commerce Dec. 15,
   2016) (final results) .............................................................................. 11

*Polyethylene Terephthalate Resin from Pakistan*, 83 Fed. Reg. 48,281
   (Dep't of Commerce Sep. 24, 2018)...................................................... 19

*Pre-Stressed Concrete Steel Wire Strand from the People's Republic of
   China*, 75 Fed. Reg. 28,557 (Dep't of Commerce May 21, 2010)........... 9

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| TEKNIK ALUMINYUM SANAYI A.S., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No. 21-00251 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALERIS ROLLED PRODUCTS, INC. et al., | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

## **ORDER**

Upon consideration of plaintiff's motions for judgment upon the administrative record, responses thereto, replies, and all other papers, it is hereby

ORDERED that the motions are denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated: _____, 2022
        New York, NY

_____
              JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| TEKNIK ALUMINYUM SANAYI A.S., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No. 21-00251 |
| UNITED STATES, | ) | |
| Defendant, | ) | PUBLIC VERSION |
| | ) | |
| and | ) | Business Proprietary |
| | ) | Information Denoted by |
| ALERIS ROLLED PRODUCTS, | ) | Brackets [ ] on Page(s) 37, 48 |
| INC. et al., | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record filed by plaintiff, Teknik Aluminyum Sanayi A.S. (Teknik), ECF Nos. 25-26 (Teknik Br.).  Teknik challenges aspects of the Department of Commerce's final determination of the countervailing duty investigation on common alloy aluminum sheet from Turkey.  As demonstrated below, Commerce's determination is supported by substantial evidence

and is not contrary to law.  Accordingly, we respectfully request that the

Court deny Teknik's motion and sustain Commerce's final

determination.

## STATEMENT PURSUANT TO RULE 56.2

## I.   The Administrative Determination Under Review

Teknik challenges the final determination of the countervailing

duty investigation covering common alloy aluminum sheet from Turkey,

published as *Common Alloy Aluminum Sheet from Turkey*, 86 Fed. Reg.

13,315 (Dep't of Commerce Mar. 8, 2021) (*Final Determination*), P.R.

344,[1] Appx___, and accompanying issues and decision memorandum

(Dep't of Commerce Mar. 1, 2021) (IDM), P.R. 341, Appx___, and order,

published as *Common Alloy Aluminum Sheet from Turkey*, 86 Fed. Reg.

22,144 (Dep't of Commerce April 27, 2021) (*Order*), P.R. 352, Appx___.

The investigation covers the period January 1, 2019, through December

31, 2019.

## II.   Issue Presented For Review

Whether Commerce's reliance on facts available and application of

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to
the record of the underlying investigation.

an adverse inference because Teknik failed to provide requested screenshots in response to Commerce's verification questionnaire is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

In March 2020, The Aluminum Association Common Alloy Aluminum Sheet Working Group and its individual members, Aleris Rolled Products, Inc., Arconic, Inc., Constellium Rolled Products Ravenswood, LLC, JW Aluminum Company, Novelis Corporation, and Texarkana Aluminum, Inc. (petitioners), filed a petition requesting that Commerce initiate an investigation on common alloy aluminum sheet from Turkey.  Petition, P.R. 1, C.R. 1, Appx___.  Commerce examined the information that petitioners provided and, on April 7, 2020, published a notice in the Federal Register initiating an investigation. *Common Alloy Aluminum Sheet from Turkey*, 85 Fed. Reg. 19,449 (Dep't of Commerce Apr. 7, 2020) (*Initiation Notice*), P.R. 37, Appx___. Commerce selected Teknik and Assan Aluminyum Sanayi ve Ticaret A.S. (Assan), for individual examination.  Respondent Selection Memorandum, P.R. 47, C.R. 12, Appx___.

In August 2020, Commerce issued its preliminary determination.

PUBLIC VERSION

*Common Alloy Aluminum Sheet from Turkey*, 85 Fed. Reg. 49,629

(Dep't of Commerce August 14, 2020) (*Preliminary Determination*),

P.R. 235, Appx___, and accompanying preliminary decision

memorandum (Dep't of Commerce August 7, 2020) (PDM), P.R. 229,

Appx___.   Commerce preliminarily determined a *de minimis* duty rate

of 0.07 percent for Teknik.   *Preliminary Determination*, 85 Fed. Reg. at

49,630, Appx___.   To arrive at the determined benefit, Commerce found

that the "Exemption from Property Tax" program conferred a 0.05

percent benefit, PDM at 15-16, Appx___, and that "other" subsidy

programs conferred a 0.02 percent benefit.   *Id.* at 25-26, Appx___.

Commerce determined that the "Exemption from Property Tax"

program (i) was countervailable as a financial contribution, as a result

of the government of Turkey foregoing revenue, under 19 U.S.C.

§ 1677(D)(ii); (ii) was specific because it was limited to companies

located within "organized industrial zones, . . . free zones, industrial

zones, technology development zones, and industrial sites," under 19

U.S.C. § 1677(5A)(D)(iv); and (iii) it conferred a benefit in the amount of

property taxes that the company was required to pay and did not, under

19 U.S.C. § 1677(5)(E).   *Id.* at 15-16, Appx___.   The "other" subsidy

programs category, which included assistance that Teknik received for exports, later determined to cover the Deduction from Taxable Income for Export program, IDM at 24, Appx\_\_\_, and potentially benefits received from "various grants and income tax programs" during the average useful life period, was countervailed based on facts available with an adverse inference (AFA).  PDM at 25-26, Appx\_\_\_.

Commerce relied on an adverse inference because the government of Turkey failed to provide any information on the assistance that Teknik received under this program.  *Id.* at 14-15, Appx\_\_\_.  For this reason, it was preliminarily determined to be a financial contribution, pursuant to 19 U.S.C. § 1677(5A), and specific, pursuant to 19 U.S.C. § 1677(5)(D).  *Id.* at 14-15, Appx\_\_\_.  Commerce also determined that Teknik received a benefit under these programs on a recurring basis pursuant to 19 U.S.C. § 1677(5)(E), *Id.* at 14-15, Appx\_\_\_, and 19 C.F.R. § 351.524(c)(1).  *Id.* at 25-26, Appx\_\_\_.  Although Commerce issued the Turkish government a supplemental questionnaire on the relevant assistance that Teknik received for exports, the Turkish government did not provide the requested information.  *Id.* at 14, Appx\_\_\_.

On January 14, 2021, Commerce issued a questionnaire in lieu of

verification (verification questionnaire) to each Teknik and Assan.

Verification Questionnaires, P.R. 313-314, Appx___.  Teknik and Assan

responded on January 22nd.  Teknik's Verification Questionnaire

Response, P.R. 320-322, C.R. 276-293, Appx___; Assan's Verification

Questionnaire Response, P.R. 323, C.R. 294-307, Appx___.  In February

2021, petitioners and Assan submitted case briefs.  Petitioners' Case

Brief, P.R. 327, C.R. 308, Appx___; Assan's Case Brief, P.R. 328, C.R.

309, Appx___.  Petitioners contended, among other things, that Teknik

failed to provide information requested by Commerce in its verification

questionnaire, and Commerce should apply facts available with an

adverse inference to Teknik.  Petitioners' Case Brief, Appx___.  Teknik,

petitioners, and Assan all filed rebuttal briefs.  Teknik's Rebuttal Brief,

P.R. 331, C.R. 310, Appx___; Petitioners' Rebuttal Brief, P.R. 333, C.R.

311, Appx___; Assan's Rebuttal Brief, P.R. 334, C.R. 312, Appx___.

Teknik responded to petitioners' arguments and rebutted that it

properly reconciled identified sales, it demonstrated that there was no

benefit for the Exemption for Property Tax and Deduction of Taxable

Income programs, and that there was no basis for Commerce to rely on

facts available with an adverse inference.  Teknik's Rebuttal Brief at 4-

15, Appx___.

The *Final Determination* was published in the Federal Register on March 8, 2021.  Commerce determined a rate of 4.34 percent for Teknik. *Final Determination*, 86 Fed. Reg. at 13,317, Appx___.  Whereas Commerce preliminarily countervailed the Exemption to Property Tax program and "other" subsidy programs based on assistance from the Turkish government to Teknik for exports, Commerce determined in its *Final Determination* that four programs were countervailable based on facts available with an adverse inference.  IDM at 4-12, Appendix, Appx___, Appx___.  These programs included the "Exemption from Property Tax" program, the "Deduction from Taxable Income for Export" program," the "Foreign Market Research and Market Entry Grants" program, and the "Foreign Fair Support" grant program.  *Id.* at 6, Appendix, Appx___, Appx___.  Commerce determined the benefit that Teknik received based on facts available with an adverse inference for all four programs because Teknik failed to provide screenshots of its accounting system, which Commerce required to verify non-use.  *Id.* at 4-12, Appx___.

Based on Commerce's hierarchy, it established a 2.11 percent

subsidy rate for the Foreign Market Research and Market Entry Grants program, a 2.11 percent subsidy rate for the Foreign Fair Support grant program, a 0.11 percent subsidy rate for the Deduction from Taxable Income for Export program, and a 0.01 percent subsidy rate for the Exemption from Property Tax program. *Id.* at 23-25, Appendix, Appx___, Appx___.

Commerce's hierarchy is a refinement of 19 U.S.C. § 1677e(d)(1), according to which it selects what it determines to be a proper subsidy rate for a program countervailed based on AFA. *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1351 (Fed. Cir. 2021); *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014) (holding that an AFA rate selected according to Commerce's countervailing duty hierarchy was a "reasonably accurate estimate" of a respondents actual rate under 19 U.S.C. § 1677e(b)); *see e.g.*, *Frozen Warmwater Shrimp from China*, 78 Fed. Reg. 50,391 (Dep't of Commerce Aug. 19, 2013) (final determination), and accompanying IDM at 13-14.

Commerce first considers whether there are any cooperating respondents in the same investigation, and then whether it calculated a

subsidy rate for the identical program for any respondents in the

investigation. *Habas Sinai*, 992 F.3d at 1351; IDM at 8-9, Appx___. If

it has, then it will rely on the highest calculated rate for the identical

program, and it may rely on a *de minimis* margin. IDM at 9-10,

Appx___. If there is no calculated rate for the identical program

belonging to a cooperating respondent in the same investigation, then

Commerce determines whether a subsidy rate exists for the identical

program in another countervailing duty proceeding involving the same

country that is above *de minimis*.[2] *Habas Sinai*, 992 F.3d at 1351; IDM

at 9-10, Appx___. If there is no subsidy rate for the identical program

in the same country, then Commerce determines whether there is a

similar or comparable program, based on the treatment of the benefit,

that was countervailed in any countervailing duty proceeding involving

the same country, and it applies the highest calculated rate if it is above

*de minimis*. *Habas Sinai*, 992 F.3d at 1351; IDM at 9-10, Appx___.

Finally, when no rates in the previous steps of the hierarchy are

---

[2] In selecting AFA rates for subsidy programs in countervailing duty proceedings, Commerce considers rates less than 0.5 percent to be *de minimis*. *See, e.g.*, *Pre-Stressed Concrete Steel Wire Strand from the People's Republic of China*, 75 Fed. Reg. 28,557 (Dep't of Commerce May 21, 2010) (final determination) and accompanying IDM at 12-13 (stating that *de minimis* means less than 0.5 percent *ad valorem*).

available, Commerce applies the highest calculated, above *de minimis*,

rate for any non-company specific program in a countervailing duty

proceeding involving the same country that the relevant respondent's

industry could conceivably use. *Habas Sinai*, 992 F.3d at 1351; IDM at

9-10, Appx___.

With respect to the Exemption from Property Tax program,

Commerce also determined a subsidy rate in the same investigation for

Assan, a cooperating respondent.  IDM at 10, Appx___.  Accordingly, for

this program, Commerce relied on a subsidy rate according to the first

stage of Commerce's hierarchy.  *Id.* at 10, Appendix n.307, Appx___,

Appx___.  The subsidy rate for Assan's identical program was 0.01

percent.  *Id.* at Appendix, Appx___.

For the remaining three programs, Commerce proceeded to

further steps of its hierarchy.  *Id.* at 11, 23-25, Appendix, Appx___,

Appx___, Appx___.  For the two grant programs, the Foreign Market

Research and Entry Grants program and the Foreign Fair Support

program, Commerce relied on the highest above *de minimis* subsidy

rate determined for the same or a comparable program from another

countervailing duty proceeding covering Turkish merchandise,

according to step three of the countervailing duty hierarchy. *Id.* at 23-25, Appendix, Appx___, Appx___. For these two programs, Commerce relied on a 2.11 percent subsidy rate determined for the Export Subsidy Program for Agricultural Products in an administrative review of the *Pasta from Turkey* proceeding because there was no identical program in this investigation and no identical program previously countervailed in any other proceeding involving Turkey. *Id.* at Appendix n.304-305, Appx___; *Pasta from Turkey*, 81 Fed. Reg. 52,825 (Dep't of Commerce Aug. 10, 2016) (prelim. results) (determining a 2.11 percent *ad valorem* subsidy rate for a respondent under the "Export Subsidy Program for Agricultural Products"); *Pasta from Turkey*, 81 Fed. Reg. 90,775 (Dep't of Commerce Dec. 15, 2016) (final results) (demonstrating no changes to the preliminary results).

For the final tax program, the Deduction from Taxable Income for Export Revenue program, Commerce relied on a 0.11 percent subsidy rate determined for the same program in the investigation of another countervailing duty proceeding involving Turkey, pursuant to the second step of Commerce's countervailing duty AFA hierarchy.

*Prestressed Concrete Steel Wire Strand from Turkey*, 85 Fed. Reg. 80,005 (December 11, 2020) and accompanying IDM at 12, Appendix.

The month following Commerce's *Final Determination*, on April 27, 2021, after the International Trade Commission's affirmative determination of injury to the domestic industry, Commerce published the *Order*. *Order*, 86 Fed. Reg. 22,144, Appx___.

## SUMMARY OF THE ARGUMENT

As a result of the Covid-19 pandemic, Commerce modified its verification procedures because on-site, in-person verification was no longer safe nor feasible.

These verification procedures required Teknik to submit screenshots of its financial accounting systems. Rather than providing these screenshots, which Teknik acknowledges it could have done, Teknik created a spreadsheet that allegedly contained the same information. Because a self-made spreadsheet does not allow Commerce to *verify* the information that Teknik alleged, Commerce appropriately relied on facts available and applied an adverse inference in reaching its *Final Determination*.

This decision is supported by substantial evidence and in

PUBLIC VERSION

accordance with law.  Commerce is entitled to use facts otherwise available when the information provided by a party cannot be verified. Further, Commerce may apply an adverse inference when a party fails to make a maximum effort to comply with Commerce's requests. Teknik acknowledges it could have provided the screenshots that Commerce requested, but instead elected to provide a self-made spreadsheet that frustrated the verification process.

Nor was Commerce's required to allow Teknik to correct its deficient verification submissions.  Neither statute nor regulation requires Commerce to allow Teknik to correct its defective submissions. Further, the Federal Circuit has recognized that verification represents a point of no return and is not an opportunity for parties to submit new information not previously requested or on the record.

Because Teknik was required to submit screenshots of its financial accounting systems and because Teknik knowingly chose not to provide those screenshots, Commerce's decision to apply an adverse fact inference should be affirmed.

# ARGUMENT

## I.    Standard Of Review

"{T}he Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Substantial evidence is "more than a mere scintilla" of relevant evidence. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). But it is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (internal quotations and citations omitted). "{T}his is something less than the weight of the evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* Rather, when Congress has entrusted an

PUBLIC VERSION

agency to administer a statute that demands inherently fact intensive inquiries—as in this administrative review—Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); *see also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." (internal quotations and citations omitted)). Lastly, it is not necessary for Commerce to provide "{a}n explicit explanation . . . where {its} decisional path is reasonably discernible." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir.

1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may uphold {an agency's} decision of less than ideal clarity if the agency's path may be reasonably discerned." (internal quotation and citation omitted))).

## II.  Because Commerce Could Not Verify Teknik's Benefit And Non-Use Of Alleged Subsidy Programs, Commerce's Reliance On AFA Is Supported By Substantial Evidence And In Accordance With Law

### A.  Commerce's Application Of Its Modified Verification Procedures Is Supported By Substantial Evidence And In Accordance With Law

Teknik raises challenges to Commerce's application of its changed verification procedures in this case.  As established below, Commerce's application of its changed procedures is supported by substantial evidence and in accordance with law.

#### 1.  Commerce Modified Its Verification Procedures Due To The Covid-19 Pandemic

Commerce determined that due to the Covid-19 pandemic it could not use its usual verification procedures to verify subsidies that Teknik allegedly received.  Commerce, therefore, modified its verification procedures.  Commerce's application of those modified procedures is supported by substantial evidence and in accordance with law.

PUBLIC VERSION

Pursuant to 19 U.S.C. § 1677m(i)(1), Commerce "shall verify all information relied upon in making a final determination in an investigation." Commerce is entitled to broad discretion regarding the manner in which it develops the record in an investigation. *Cf. Stupp Corp. v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021) (holding that Commerce is entitled to broad discretion regarding the manner in which it develops the record in an antidumping investigation); *see also PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2021) ("{C}ourts will defer to the judgment of an agency regarding the development of the agency record."); and *Micron Tech. v. United States*, 117 F.3d 1386, 1395 (Fed. Cir. 1997) ("Commerce is afforded broad discretion with regard to the conduct of investigations. Commerce has 'the discretionary authority to determine the extent of investigation and information it needs.'"). Further, the Federal Circuit has held that "Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021); *Stupp*, 5 F.4th at 1350; *Micron Tech.*, 117 F.3d at 1396. The Court has also held that "Commerce enjoys 'broad discretion' to promulgate and enforce its procedural rules."

*Goodluck India*, 11 F.4th at 1343 (citing *Stupp*, 5 F.4th at 1350-51

("Short of a showing that Commerce's enforcement of its procedural

rules is so haphazard or unreasonable as to be arbitrary or

capricious, . . . Commerce's failure to apply those rules with Procrustean

consistency in every case does not deprive it of the authority to enforce

those rules in any case.")).  Additionally, "the decision to select a

particular verification methodology rests solely within Commerce's

sound discretion." *Tianjin Mach. Imp & Exp. Corp. v. United States*,

353 F. Supp. 2d 1294, 1301 (Ct Int'l Trade 2004) (quoting *Hercules, Inc.*

*v. United States*, 673 F. Supp. 454 (Ct. Int'l Trade 1987), *aff'd per*

*curiam*, 146 Fed. Appx. 493 (Fed. Cir. 2005).  In sum, "the statute gives

Commerce wide latitude in its verification procedures." *Stupp*, 5 F.4th

at 1350 (citing *Am. Alloys v. United States*, 30 F.3d 1469, 1475 (Fed.

Cir. 1994)).

　　　Commerce's cancelation of on-site, in-person verification and its

decision not to reschedule, when it determined that verification would

be unsafe for Commerce personnel, has also been held lawful.

*Torrington Co. v. United States*, 68 F.3d 1347, 1349-53 (Fed. Cir. 1995)

(affirming the trial court's holding that sustained Commerce's decision

to cancel on-site verification in a first administrative review because the outbreak of the Persian Gulf War made air travel in Europe by Commerce personnel unsafe). Although Commerce generally prefers to conduct on-site verification, it is not required to do so. *Id.*; *see also Brake Rotors from the People's Republic of China*, 64 Fed. Reg. 61,581, 61,587-89 (Dep't of Commerce Nov. 12, 1999) (conducting verification at an off-site location in Beijing, due to security concerns arising from a May 1999 NATO bombing incident in Belgrade Yugoslavia). Indeed, Commerce has canceled on-site verification and held verification in Washington, D.C., when travel in the respondents' home country was not feasible. *Polyethylene Terephthalate Resin from Pakistan*, 83 Fed. Reg. 48,281, 48,283 n.6 (Dep't of Commerce Sep. 24, 2018) (explaining that, due to a travel advisory issued by the State Department, Commerce determined that a respondent's sales verification would be held at an alternate location in Washington, D.C., but also stating that physical documentation would be shipped to the alternate site and Commerce would be provided with adequate remote access to the respondent's electronic systems).

     Commerce's regulation, 19 C.F.R. § 351.307(b), also provides that

PUBLIC VERSION

Commerce verifies factual information it relies on in a countervailing duty investigation. Typically, under 19 C.F.R. § 351.307(d), when Commerce conducts a verification, it requests access to "all files, records, and personnel" that Commerce "considers relevant to factual information submitted of," among others, "{p}roducers, exporters, or importers." Although Commerce generally conducts verification on-site and in person, neither 19 U.S.C. § 1677m(i) nor Commerce's regulations require Commerce to do so.

In this investigation, Commerce modified its typical verification procedures because of the Covid-19 pandemic. IDM at 21, Appx___. Because Commerce determined that on-site verifications presented concerns with respect to the safety of its staff traveling abroad to respondent-facilities, Commerce developed and implemented verification procedures relying on questionnaires issued to individually examined respondents in lieu of on-site verifications. *Id.* at 21, Appx___; Verification Questionnaires, Appx___. In its verification questionnaires, Commerce requested additional documentation and information from respondents to conduct verification, without requiring its personnel to travel to the respondents' facilities. IDM at 21,

PUBLIC VERSION

Appx___.  The documentation and information that Commerce requested included screenshots "of all accounts where government subsidy income is or would be recorded."  Teknik Verification Questionnaire at 3-4, P.R. 314, Appx___.  This information was necessary to verify that the respondents' questionnaire responses and reconciliations were accurate, compared to their accounting books and records.  IDM at 21, Appx___.

Commerce requested this information to verify whether the information that both Teknik and Assan reported was accurate and complete and to determine whether the screenshots of their financial accounting systems support their questionnaire responses, submitted reconciliations, and reported non-use of certain programs.  IDM at 21, Appx___.  Commerce's verification questionnaires, therefore, reflected its standard verification procedures to the extent possible, in light of the Covid-19 pandemic, IDM at 21, Appx___, and conformed with 19 U.S.C. § 1677m(i) and Commerce's regulations.  Teknik does not contest Commerce's modified verification procedures resulting from the Covid-19 pandemic, but it does challenge Commerce's application of these procedures.

## 2. Commerce Properly Applied Its Procedures To Teknik's Submissions

Regarding Commerce's verification of Teknik, Commerce issued Teknik a verification questionnaire, in lieu of on-site verification, on January 14, 2021. Teknik Verification Questionnaire at 1, Appx___. In the questionnaire, Commerce explained that it was issuing a set of questions "in lieu of performing an on-site verification, to collect additional or supporting documentation related to information that {Teknik} already submitted in th{e} investigation." *Id.* Commerce also emphasized that, as with its requests for documentation for on-site verifications, its questionnaire was "not a request for new information." *Id.* Commerce additionally explained that, if it did not receive the requested information by the established deadline, it "may conclude that {Teknik} has decided not to cooperate in {the investigation}." *Id.* at 2, Appx___. Most important, Commerce cautioned that failure to submit a response to all requests in its verification questionnaire "may result in the application of partial or total facts available pursuant to section {19 U.S.C. § 1677e(a)}, which may include inferences pursuant to {19 U.S.C. § 1677e(b)}." *Id.*

Teknik argues that Commerce's typical in-person verification

PUBLIC VERSION

process is an "interactive exercise" during which respondents "provide supporting documentation to Commerce and can supplement said documentation should Commerce feel that the information provided is not sufficient." Teknik Br. at 21. The Federal Circuit, however, holds that "{v}erification represents a point of no return" and "{t}he purpose of verification is 'to test information provided by a party for accuracy and completeness.'" *Goodluck*, 11 F.4th at 1343-44. Although Commerce may provide clarification when necessary, the purpose of verification is to verify information that was previously submitted by a respondent. *See Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1348 (Ct. Int'l Trade 2021) (delineating that Commerce's verifications are "not intended to be an opportunity for the submission of new factual information" and "information will be accepted at verification only when the information is requested by verifiers . . . to corroborate, support, and clarify factual information already on the record").

Similarly, if Teknik did not understand the process or thought that Commerce would prefer an alternative form of requested verification documentation, Teknik should have sought clarification of Commerce's verification questions. Teknik did not seek clarification

from Commerce. Instead, Teknik evaluated Commerce's verification questionnaire, which asked Teknik to "provide screenshots of the relevant accounts in which the benefits received . . . are recorded" and "provide screenshots of all accounts where government or subsidy income is or would be recorded," and it determined, without consulting Commerce, to develop an Excel spreadsheet purportedly containing the same information, as stated in Teknik's accounting system, instead of providing the requested screenshots. *See* Teknik's Verification Questionnaire Response at 5-6, Exhibit V-14, P.R. 320, C.R. 276, 289, Appx___, Appx___; Teknik's Administrative Rebuttal Brief at 11, Appx___. Teknik ignored, without seeking clarification, Commerce's instructions to provide screenshots, and it substituted an alternative representation of the relevant account ledger, which prevented Commerce from examining the account ledger in the context of Teknik's accounting system. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce.). Because Teknik failed to provide the requested verification screenshots, Commerce properly relied on facts available.

### 3. Commerce Was Not Required To Issue A Verification Report

Teknik also argues that Commerce's decision not to issue a verification report was inconsistent with 19 C.F.R. § 351.307(c). Teknik Br. at 28-29. This argument lacks merit for two reasons. First, Teknik never argued to Commerce that it needed to issue a separate verification report. Congress has directed that "the Court of International Trade shall, where appropriate require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 910 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1378–80 (Fed. Cir. 2007)). The purpose of the exhaustion requirement—to promote judicial efficiency and to preserve administrative autonomy by allowing the agency to consider the party's argument and potentially rectify any mistake—is vitiated when a court considers arguments raised for the first time in judicial proceedings. *Id.*; *accord Corus Staal*, 502 F.3d at 1379–80.

For this reason, the court should "generally take{} a 'strict view' of

PUBLIC VERSION

the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *See Corus Staal*, 502 F.3d at 1379. Accordingly, administrative exhaustion generally requires a party to present all arguments in its administrative case and rebuttal briefs before raising those issues before this court. *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010). An exception to the exhaustion requirement may be made only if exhaustion would have been "futile" or the relevant matter is a "pure question of law." *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–48 (Fed. Cir. 2013). This Court has held that exceptions also may be possible if an intervening court decision would affect the agency's action, or a party had no reason to believe the agency would not follow established precedent. *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002)).

Teknik never argued that Commerce was required to issue a separate verification report during the course of the investigation, and Commerce was, accordingly, denied the opportunity to address this concern at the administrative level. Having failed to exhaust its administrative remedies, Teknik is not permitted to raise the issue

PUBLIC VERSION

before the Court.

Second, although Commerce typically issues verification reports when it conducts on-site verifications, there is no requirement in 19 C.F.R. § 351.307(c) that a report issue. Consistent with its regulation, Commerce reported the methods, procedures, and the results of the verification on the administrative record. Teknik Verification Questionnaire, Appx___; Teknik's Verification Questionnaire Response, Appx___; IDM at 2, 4-12, 21-25, Appx___, Appx___, Appx___. Under Commerce's verification questionnaire, every question that Commerce posed to the respondents and every answer provided by the respondents are on the administrative record. *See* Teknik Verification Questionnaire, Appx___; *see also* Teknik's Verification Questionnaire Response, Appx___; Assan's Verification Questionnaire Response, Appx___. Commerce acted in accordance with its regulation such that all parties were aware of the methods, manner, and results of its verification. Nothing more is required. Indeed, the Federal Circuit recently characterized Commerce's completion of verification reports as permissive. *Stupp Corp.*, 5 F.4th at 1349 ("Commerce *may* issue a verification report before issuing a final determination to 'verify

PUBLIC VERSION

relevant factual information' that it previously gathered pursuant to its

investigation or review." (emphasis added)).  Accordingly, even if

Teknik had exhausted its administrative remedies with respect to this

argument, which it has not, the argument fails on the merits because

Commerce complied with the regulation's requirements.

### B.    Commerce's Reliance On Facts Available With An Adverse Inference Because Teknik Failed To Provide Requested Verification Screenshots Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination to apply an adverse inference in

selecting from among the facts available, with respect to the benefit

and non-use of four subsidy programs is supported by substantial

evidence and in accordance with law.  Under 19 U.S.C. § 1677e(a),

Commerce shall use the facts otherwise available in reaching a

determination under the statute, if (1) necessary information is not on

the record, or (2) an interested party or any other person (A) withholds

information that has been requested; (B) fails to provide such

information within the deadlines for submission of the information or

in the form and manner requested by Commerce, subject to subsections

19 U.S.C. §  1677m(c)(1) and (e), (C) significantly impedes Commerce's

proceeding; or (D) provides information but the information cannot be

PUBLIC VERSION

verified as provided by 19 U.S.C. § 1677m(i).  Under 19 U.S.C. § 1677e(b), Commerce may use an inference that is adverse to a party in selecting from among the facts otherwise available if Commerce determines that the party has failed to cooperate by not acting to the best of its ability to comply with a request for information from Commerce.  These provisions are the basis for Commerce's "adverse facts available" methodology.

### 1. Teknik's Failure To Provide The Information Requested By Commerce Should Not Be Excused

Teknik argues that its failure to provide the information requested by Commerce should be excused because Commerce never gave Teknik an opportunity to correct its errors.  As shown below, Commerce acted in accordance with the law.

Pursuant to 19 U.S.C. § 1677m(e), Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to {Commerce's} determination," unless the information does not meet any of five statutory requirements.  Most relevant to this case, Commerce may decline to consider information when the information cannot be verified.  19 U.S.C. § 1677m(e)(2).

Additionally, 19 U.S.C. § 1677m(d) provides that if Commerce

PUBLIC VERSION

"determines that a response to a *request for information* . . . does not

comply with the request," Commerce "shall promptly inform the person

submitting the response of the nature of the deficiency and shall, to the

extent practicable, provide that person with an opportunity to remedy

or explain the deficiency in light of the time limits established for the

completion of investigations or reviews." 19 U.S.C. § 1677m(d)

(emphasis added).  The Federal Circuit, however, explains that "{t}he

purpose of *verification* is 'to test information provided by a party for

accuracy and completeness.'" *Goodluck India*, 11 F.4th at 1343-44

(emphasis added).  As such, 19 U.S.C. § 1677m(d) is "inapplicable at the

verification stage." *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d

1321, 1349 (Ct. Int'l Trade 2020).  Accordingly, requests by Commerce

in the context of verification are not a "request for information," but a

collection of documentation needed to verify information that is

ostensibly already on the record.

Indeed, "{v}erification—unlike Commerce's questionnaires sent to

respondents at the beginning of an investigation or an administrative

review—does not entail a 'request for information under {19 U.S.C.

§ 1677m(d)}.'" *Id.* "Instead, verification entails 'verifying information'

PUBLIC VERSION

previously provided by a respondent in its questionnaire answers." *Id.* (citing 19 U.S.C. § 1677m(i)). "Verification is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information." *Id.* This distinction establishes that Commerce's verification questionnaire is not a "request for information," but for a collection of documentation to confirm that a respondent's submissions in response to prior requests for information are accurate and complete.

Likewise, 19 C.F.R. § 351.301(c) establishes various deadlines for parties to respond to requests for information by Commerce. Although Commerce may at times request information after it completes a preliminary determination, 19 C.F.R. § 351.301(c)(5) establishes general deadlines for when parties may submit "information not directly responsive to or relating to" other deadlines in 19 C.F.R. § 351.301(c), each pertaining to a specific type of submission. None of the deadlines to submit factual information to Commerce's record, except on a case specific basis when Commerce has invited the information, exceeds the deadlines in 19 C.F.R. § 351.301(c)(5). 19 C.F.R. § 351.301(c)(5)

(providing that "{t}he deadline for filing such information will be 30 days before the scheduled date of the preliminary determination in an investigation, or 14 days before verification, whichever is earlier).

Requiring Commerce to issue a notice of deficiency with respect to a party's failure to provide requested documentation in response to a verification questionnaire would be inconsistent with the regulatory scheme and expose Commerce to new, unnecessary requirements. Imposing such a burden on Commerce during verification is not practicable, and 19 U.S.C. § 1677m(d), even if relevant to verification, requires Commerce inform parties of a deficiency only "to the extent practicable."  In any event, section 1677m(d) does not refer to information requested during verification.  *Hung Vuong*, 483 F. Supp. 3d at 1349 ({T}he Court construes § 1677m(d) as inapplicable at the verification stage.").  Accordingly, the Court should reject Teknik's argument that Commerce's purported "refusal" to allow Teknik to address insufficiencies was an abuse of discretion and not in accordance with 19 U.S.C. § 1677m(d).  Teknik Br. at 26.

### 2.   Teknik Chose To Submit Noncompliant Submissions

Where a party fails to sufficiently comply with Commerce's

PUBLIC VERSION

verification efforts, and Commerce cannot verify reported information, Commerce relies on facts available and, when necessary, it applies an adverse inference. *Tianjin Mach.*, 353 F. Supp. 2d at 1300-2 (sustaining Commerce's reliance on facts available and application of an adverse inference when a respondent's factory "failed verification"); *Goodluck India*, 11 F.4th at 1341, 1344 (reversing and remanding a decision by the Court of International Trade that remanded a determination by Commerce, which relied on facts available with an adverse inference where a respondent failed verification).  The Court has held that Commerce is under no obligation to request corrected submissions for errors discovered at verification.  Rather, a respondent has a "statutory obligation to prepare an accurate and complete record in response to questions plainly asked." *Acciai Speciali Terni S.P.A. v. United States*, 142 F. Supp. 2d 969, 260 (Ct. Int'l Trade 2001).

Commerce determined that Teknik "failed to provide many of the screen shots from its accounting ledgers in its in lieu of on-site verification response."  IDM at 6, Appx___.  Commerce further explained that it requested these screenshots "to examine the completeness and accuracy of reported information."  *Id.* at 6, Appx___.

PUBLIC VERSION

In its verification questionnaire, Commerce requested information pertaining to two tax programs, the Deduction from Taxable Income for Exports and the Exemption from Property Tax programs, which Commerce countervailed in its *Preliminary Determination*. *Id.* at 21-22, Appx___. Commerce also requested screenshots from Teknik's accounting system relating to programs that Commerce determined, in the *Preliminary Determination*, Teknik did not use or benefit from, including two grant programs, the Foreign Market Research and Market Entry and the Foreign Fair Support grant programs. IDM at 22-23, Appx___; Teknik Verification Questionnaire at 4, Appx___ (Question 5 requests screenshots of all accounts where government or subsidy income is or would be recorded, references "disbursements of grants," and requests Teknik "identify in the screenshots all amounts {Teknik} previously reported to Commerce as 'other subsidy programs'/grants."). As a result, Commerce determined that Teknik provided requested information, but the information could not be verified. Therefore, Commerce relied on facts available pursuant to 19 U.S.C. § 1677e(a)(D).

In addition to failing to provide screenshots of its internal

accounting system to support reported benefits and non-use, Teknik

acknowledged that it could have submitted the screenshots, but averred

that the relevant ledger was "big" and "providing multiple screen

shots . . . would not have provided any meaningful information" to

Commerce.  IDM at 22, n.126, Appx___; Teknik's Administrative

Rebuttal Brief at 11, Appx___.  Because Teknik acknowledged that the

ledger was available, and it could have provided screenshots from its

accounting system, but chose not to, Commerce determined that Teknik

failed to cooperate by not acting to the best of its ability and applied an

adverse inference in selecting from among the facts available, pursuant

to 19 U.S.C. § 1677e(b).  IDM at 22-23.

Specifically, Commerce set out its process for applying facts

available with an adverse inference as a result of Teknik's failure to

provide relevant screenshots in response to questions 4 and 5 of

Commerce's verification questionnaire.  IDM at 7, Appx___.  In question

4, Commerce asked Teknik to "provide screenshots" of the relevant

accounts in which the benefits received" for the Deduction from Taxable

Income for Export program and the Exemption from Property Tax were

recorded.  Teknik Verification Questionnaire at 3-4, Appx___; IDM at 7,

PUBLIC VERSION

Appx___.  In response, Teknik provided a screenshot of the accounting

entry for receipt of a benefit pertaining to the Deduction from Taxable

Income for Export program, in Exhibit V-12, and stated that for the

Exemption from Property Tax program, there is no indication in

Teknik's accounting system because the benefit is merely "an absence of

payment."  Teknik's Verification Questionnaire Response at 5, Exhibit

V-12, P.R. 320-321, C.R. 276, Appx___, Appx___.

With respect to question 5, Commerce asked Teknik to "{p}rovide

screenshots of all accounts where government or subsidy income is or

would be recorded," Commerce qualified that "if such income is booked

into multiple accounts," then Teknik should "provide screenshots for

only one of the accounts."  Teknik Verification Questionnaire at 4,

Appx___.  Commerce further asked Teknik to provide relevant excerpts

from the Turkish Generally Accepted Accounting Principles

establishing that the accounts it reported "would include any

disbursements of grants from the Government of Turkey . . ., and any

rebates of taxes or fees."  *Id.*  Commerce also asked that Teknik

"{p}rovide a description of each amount indicated in the screenshots

received from the {Turkish Government} or any organization that may

be considered an agency of the {Turkish Government} that is greater than {1,000,000 Turkish lira}." *Id.* Finally, Commerce asked Teknik to identify in the screenshots "all amounts {it} previously reported to Commerce as 'other subsidy programs'/grants." *Id.*

In response, Teknik reported that any subsidy income from the government of Turkey would be credited in one account ledger, [              ], titled [                                        ]. Teknik's Verification Questionnaire Response at 6, Appx___. Teknik again referred to Exhibit V-12 as showing that income received from the Government of Turkey, for purposes of the Deduction of Taxable Income for Export program was credited to this account. *Id.*, Appx___. Teknik also provided a representation that Exhibit V-14 contained the relevant account ledger and allegedly contained all the transactions within the account for the period of investigation. Teknik's Verification Questionnaire Response at 6, Exhibit V-14, Appx___, Appx___; IDM at 7, Appx___. However, Exhibit V-14, rather than a screenshot, was an excel spreadsheet purportedly containing the same information as Teknik's accounting system. Teknik's Verification Questionnaire Response at 6, Exhibit V-14, Appx___, Appx___; IDM at 7, n.38,

PUBLIC VERSION

Appx___, Appx___.

Commerce properly determined that an excel spreadsheet did not constitute a screenshot.  Indeed, Commerce specifically requested screenshots from Teknik's accounting system for programs that Commerce previously countervailed and those that Commerce preliminarily determined Teknik did not use during the period of investigation.  Teknik failed to submit such screenshots, which were necessary so that Commerce could confirm whether the reconciliation, which Teknik previously submitted, corroborated its reported benefits and non-use of certain programs.  Teknik's July 20, 2020 Supplemental Questionnaire Response at Exhibit S1-2.b, P.R. 219, C.R. 186, Appx___, and resubmitted as Exhibit V-2, Appx___; *see also* IDM at 21-22, Appx___; Teknik's Verification Questionnaire Response at 5-6, Exhibit V-12, Exhibit V-14, P.R. 320-321, C.R. 276, 289, Appx___, Appx___, Appx___.  Commerce, thus, determined that Exhibit V-14 "is a worksheet that does not contain screen shots from the actual account ledger" containing the underlying information.  IDM at 7, Appx___.

Teknik alleges that Commerce's decision not to allow Teknik to provide "clarifying" or "further information" when Commerce deemed

PUBLIC VERSION

supporting information insufficient is contrary to Commerce's "mandate
to ensure fair and accurate determinations."  Teknik Br. at 22-23 (citing
*Neenah Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1016 (Ct.
Int'l Trade 2001)).  Citing *Neenah Foundry*, Teknik argues that "fair
and accurate determinations are fundamental to the proper
administration of . . . trade laws, and courts have uniformly authorized
the correction of any clerical errors which would affect the accuracy of a
determination."  142 F. Supp. 2d at 1016 (citing *Koyo Seiko Co. v.
United States*, 682 F. Supp. 1108, 1110 (Ct. Int'l Trade 1990)).

However, in this investigation, Commerce evaluated the record
and determined that it could not verify certain information reported by
Teknik.  As explained above, Commerce requested certain screenshots
of Teknik's accounting system that Teknik failed to provide.  IDM at 6,
Appx___.  Commerce acknowledges that fair and accurate
determinations aid the proper administration of trade laws, but also
observes that it cannot properly verify information in Teknik's
questionnaire responses relating to non-use.  *Id.* at 6-7, 21-22, Appx___,
Appx___.

Moreover, characterizing Commerce's determination as "unfair"

and "inaccurate" diminishes the significance of the verification process and overlooks the importance of respondents complying with requests by Commerce.  Pursuant to 19 U.S.C. §§ 1677e(a) Commerce "shall" rely on facts available when information cannot be verified.  Further, when a party has not cooperated, Commerce may resort to adverse inferences about the information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. Statement of Administrative Action of the Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, Vol. I, at 870.  Commerce determined that Teknik did not cooperate because it failed to provide screenshots requested by Commerce that were necessary to its verification.  IDM at 6, Appx___.  Commerce consequently was unable to verify all of Teknik's information and resorted to facts available.

### 3. Commerce's Decision To Rely On An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law

The purpose of the "{c}ompliance with the 'best of its ability' standard is determined by assessing whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v.*

PUBLIC VERSION

*United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* In sum, Commerce does not need to show that a respondent's noncooperation was intentional to apply AFA, only that the respondent did not put forth its "maximum effort possible." *Tianjin Mach.*, 353 F. Supp. 2d at 1305. This standard "censures inattentiveness and carelessness." *Id.* Moreover, when a party has not cooperated, Commerce may rely on adverse inferences about the information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. Statement of Administrative Action of the Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, Vol. I, at 870.

Teknik asserts that it "fully responded to each request for information within the time period requested by Commerce and in the requested format." Teknik Br. at 41. This assertion is objectively false. As declared in Commerce's IDM and indicated by Teknik in its administrative rebuttal brief, Teknik's Administrative Rebuttal Brief at 11 ("Since the ledger for the {period of investigation} was big, providing

multiple screen shots for the {period of investigation would not have presented any meaningful information.")}, Appx___, Teknik did not provide documentation in the form that Commerce requested– screenshots.  Screenshots would have allowed Commerce to review Teknik's accounting system and to review the entries in any related ledgers and accounts to confirm that Teknik did not benefit from any of the reported non-used subsidy programs.

Teknik next contends that Commerce's determination based on facts available with an adverse inference is contradicted by the administrative record.  Teknik Br. at 40-41.  For the reasons explained above, Commerce was not able to verify Teknik's use or non-use of the four identified subsidy programs because Teknik failed to provide essential verification documents that Commerce requested.  Moreover, *Guizhou*, the case that Teknik cites to argue that Commerce may not "disregard {} information of record that is not missing or otherwise deficient," Teknik Br. at 40-41 (citing *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1342-44 (Ct. Int'l Trade 2019), is distinct from this case.

In *Guizhou*, Commerce determined that it could not verify non-use

of the Chinese Export Buyer's Credit Program.  415 F. Supp. 3d at

1340-44.  More specifically, Commerce found that it could not verify

non-use of the program because the Chinese government refused to

provide necessary information about how the program worked and

without that information Commerce's verification of a respondent would

amount to looking for a needle in a haystack.  *Id.* at 1341.  In this case,

Commerce sought to verify Teknik's use and non-use of four programs,

but Teknik, as a respondent and not a foreign government, failed to

provide the precise type of documents that Commerce explicitly

requested in its verification questionnaire.  For this reason, Commerce's

application of AFA is distinct from *Guizhou* and relates to a

respondent's failure to provide requested information precluding

Commerce from properly verifying the degree and whether it indeed

benefitted from certain programs.

Teknik next claims that it provided more information to

Commerce than requested.  Teknik Br. at 24.  Teknik states that it

provided "the entire, actual account ledger, rather than mere

screenshots of portions of the same ledger," allegedly demonstrating

that Teknik participated in the investigation to the best of its ability.

PUBLIC VERSION

Teknik Br. at 24-25.  Commerce requested that Teknik provide "screenshots of the relevant accounts in which the benefits received . . . are recorded."  Teknik Verification Questionnaire at 3, Appx___.  Commerce asked that the screenshots show "all accounting entries in the relevant accounts for the period of review."  *Id.*, Appx___. At the same time, Commerce also explained that Teknik should provide "screenshots of all accounts where government or subsidy income is or would be recorded."  *Id.* at 4, Appx___.  Commerce provided instructions and, if there was any question regarding the documentation that Commerce required, Teknik should have clarified its uncertainty with Commerce.  Moreover, even if Teknik provided more information than Commerce requested in response to one question, Teknik's diligence with respect to one aspect of a questionnaire does not make up for its failure to provide requested information with respect to another aspect of the questionnaire.  Because Commerce was unable to verify the use or non-use of the relevant programs that Teknik benefitted from during the period of review, Commerce properly relied on facts available with an adverse inference to determine the benefit that Teknik received for relevant subsidy programs.

PUBLIC VERSION

Teknik next claims that it decided to submit its complete account ledger in excel format, rather than screenshots as requested, because "Teknik wanted to submit the complete ledger showing all the transactions for the {period of investigation} as opposed to a screen shot which would have only provided Commerce with the {period of investigation} total." Teknik Br. at 46.  Similar to Commerce's responses above, Commerce explicitly requested screenshots of relevant information in Teknik's accounting system to verify use and non-use. Teknik Verification Questionnaire at 4, Appx___.  Teknik's failure to provide the requested information precluded Commerce from verifying the extent that Teknik received benefits for the relevant programs during the period of investigation in its accounting system in the ordinary course of business.  If Teknik misunderstood Commerce's request, it should have notified Commerce and asked for clarification. Teknik never requested clarification from Commerce or communicated any reason as to why the screenshots that Commerce requested would be preferably presented as a spreadsheet.  Moreover, Teknik could have submitted the requested screenshots alongside the allegedly clarifying spreadsheets that Teknik believed would be more helpful.  Teknik,

however, chose not to comply with Commerce's request.

Teknik argues that Commerce mischaracterized Exhibit V-14 as a "worksheet" when the exhibit contains the "complete and actual account ledger of which income was accounted for during the period of investigation." Teknik Br. at 37.  Although Teknik takes issue with Commerce's characterization of the data provided in Exhibit V-14 as a "worksheet," Teknik glosses over the fact that it did not provide screenshots, as requested, of the relevant account information. Regardless of whether Exhibit V-14 is a "worksheet" or a spreadsheet, reproducing the information from Teknik's account ledger, by not providing requested screenshots, Teknik prevented Commerce from viewing the account information in its original format.

Although Teknik asserts that the information it provided is the same, Commerce needed to view the information in the accounting system to verify the veracity of Teknik's statements.  IDM at 22, Appx___.  Commerce explained the importance of the requested screenshots in stating that they were "necessary for Commerce's analysis to contextualize and validate the information Teknik submitted in its questionnaire responses." *Id*.  Commerce also further

elaborated that the screenshots would have allowed Commerce "to see the actual information as portrayed in Teknik's financial accounts and ledgers" as represented in Teknik's accounting system.  *Id.*

In other words, here Commerce determined that *in situ* screenshots of a respondent's accounting system were critical to Commerce's modified verification process because, if Commerce were to accept mere representations of the information, alleged by a respondent to exist in its accounting system, Commerce would be relying on a submission no different from the submission that the respondent filed in its response to Commerce's initial and supplemental questionnaires. Such a submission would be redundant and lack the provenance appropriately attributed to screenshots portraying a respondent's accounting system.

Commerce requested the screenshots to verify that the respondent's questionnaire response is "accurate and complete."  *Id.* at 21-22, Appx___.  Accordingly, Commerce determined that it was unable to verify that Teknik did not benefit from the two tax programs and two grant programs because it could not view a snapshot of the relevant account ledger in Teknik's accounting system.  *Id.* at 21-25, Appx___.

PUBLIC VERSION

Therefore, Commerce appropriately considered the facts available and relied on an adverse inference in making its determination with respect to the amount Teknik benefitted from these four programs.  Regardless of whether Commerce labels the information presented in Exhibit V-14 as a "worksheet" or a spreadsheet, this exhibit is not a screenshot of Teknik's account ledger in its accounting system, but a purported and unverifiable representation of that information.  For this reason, Commerce determined that it could not rely on Exhibit V-14 and, accordingly, that the information therein was unverifiable.

Teknik also argues that it provided screenshots, as requested by Commerce, in Exhibit V-12.  Teknik Br. at 44.  Although Commerce acknowledged that Exhibit V-12 contains "a screen shot of the accounting entry" for a receipt of one disbursement of a tax program, [                                                                    ], Teknik's failure to provide a screenshot of the relevant account containing the information in Exhibit V-14 prevents Commerce from verifying further non-use of this program.  IDM at 21, Appx___.  Because Commerce cannot rely on the spreadsheet in Exhibit V-14, it cannot confirm based on Teknik's actual accounting system that Teknik did not receive further

disbursements under this program.

Further, Teknik contends that Commerce did not ask any questions about the two grant programs in its verification questionnaire. Teknik Br. at 55-56. However, Commerce did reference grant programs in question 5 of its verification questionnaire. Teknik Verification Questionnaire at 4, Appx___. In verifying non-use of certain programs, Commerce focused on grant programs by asking for "relevant excerpts from Turkish Generally Accepted Accounting Principles" establishing that certain accounts would include "any disbursements of grants from the government of Turkey." *Id.*, Appx___. Commerce also referenced grants when it asked Teknik to identify in its screenshots "all amounts" Teknik "previously reported to Commerce as 'other subsidy programs'/grants." Although Commerce did not reference the Foreign Market Research and Market Entry and Foreign Fair Support grant programs by name in its verification questionnaire, Commerce did reference grant programs generally, and these two grant programs were also reported both by the Turkish government and Teknik as relevant to Teknik. GOT's June 15, 2020 Questionnaire Response at 139-183, P.R. 104, C.R. 25, Appx___; Teknik's June 15,

2020 Questionnaire Response at pages CVD-38 to CVD-39, P.R. 154,

C.R. 67, Appx___.

Teknik acknowledges that it had the necessary information to comply with Commerce's verification procedures. Teknik, however, chose to frustrate the verification process by providing allegedly the same information in a different format in an apparent effort to avoid producing multiple screenshots of a large ledger. By changing the format, Commerce could no longer *verify* the information. Accordingly, Commerce was entitled to rely on an adverse inference.

### 4. Commerce's Decision To Reject Teknik's Sales Reconciliation Is Supported By Substantial Evidence And In Accordance With Law

Finally, Teknik asserts that Commerce's determination to reject Teknik's sales reconciliation is "in direct conflict with Commerce's findings in the concurrent {antidumping} investigation" in which Teknik was also a mandatory respondent. Teknik Br. at 58-61. Teknik contends that "the same documentation was provided at verification for sales reconciliation purposes." But, as this Court and the Federal Circuit have long recognized, each segment of a proceeding stands on its own, and the proper record must be developed in each segment.

*Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018) (citing *Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012) ("Commerce must base its decisions on the record before it in each investigation")); and *Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005) ("{E}ach administrative review is a separate segment of proceedings with its own unique facts.")); *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 ("Each review constitutes a separate segment within the same administrative proceeding.").  Regardless of Commerce's finding with respect to whether Teknik's reconciliation could be verified independently, regarding question 1 of Commerce's verification questionnaire, Commerce determined that Teknik failed to provide screenshots of its accounting system allowing Commerce to verify non-use of the relevant programs in this case.  IDM at 6-7, Appx___.  Teknik does not elaborate on how its reconciliations in the antidumping and countervailing duty proceedings are the same.  Still, assuming, *arguendo*, that Commerce did accept an identical reconciliation for the same purpose in the parallel antidumping investigation, Teknik still did not provide screenshots of its accounting

system, which Commerce could rely on to verify non-use. Without the screenshots, Commerce could not verify that the benefits, and lack thereof, of the programs that Teknik benefitted from were accurate. Accordingly, any varying treatment of reconciliations between the antidumping and countervailing duty investigations would be, at best, harmless error.

As a result of the missing screenshots relating to the benefit that Teknik received for each of the four programs identified above, Commerce was unable to verify Teknik's benefit for each program. IDM at 22-23, Appx___. Additionally, Commerce determined to apply an adverse inference in selecting from among the facts available because Teknik acknowledged that it could have provided screenshots from its accounting system and did not. *Id.* For this reason, Commerce properly determined to rely on facts available because the requested and required verification screenshots were not on the record, and Commerce properly applied an adverse inference because Teknik failed to cooperate by not acting to the best of its ability in complying with Commerce's request, pursuant to 19 U.S.C. §§ 1677e(a) and (b). Commerce's determination should therefore be sustained.

# CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney
General

PATRICIA M. MCCARTHY
Director

/s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          /s/Kyle S. Beckrich
                                     KYLE S. BECKRICH
BRENDAN SASLOW                       Trial Attorney
Senior Attorney                      U.S. Dept. of Justice
Office of the Chief Counsel          Civil Division/National Courts
    for Trade Enforcement and        P.O. Box 480
    Compliance                       Ben Franklin Station
U.S. Department of Commerce          Washington, D.C. 20044
Washington, D.C.                     Telephone: (202) 616-9322
                                     Fax: (202) 616-9322
                                     E-mail: kyle.beckrich@usdoj.gov

January 21, 2022                     Attorneys for Defendant

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 9,475 words, including text, footnotes, and headings.

<u>/s/Kyle S. Beckrich</u>
Kyle S. Beckrich