NONCONFIDENTIAL
VERSION

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| TEKNIK ALUMINYUM SANAYI A.S., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No.  21-00251 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| and ) | |
| ) | |
| ALUMINUM ASSOCIATION ) | |
| COMMON ALLOY ALUMINUM SHEET ) | |
| TRADE ENFORCEMENT WORKING ) | |
| GROUP, et al., ) | |
| ) | |
| Defendant-Intervenors. ) | |

**FINAL DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON
THE AGENCY RECORD**

John M. Herrmann
Kathleen W. Cannon
Elizabeth C. Johnson
**KELLEY DRYE & WARREN LLP**
**3050 K Street N.W., Suite 400**
**Washington, D.C. 20007**

Dated:  March 25, 2022

**NONCONFIDENTIAL
VERSION**

# Table of Contents

**Page**

TABLE OF AUTHORITIES ................................................................. ii-iv

GLOSSARY ........................................................................................ v

RULE 56.2 STATEMENT ................................................................... 1

SUMMARY OF ARGUMENT ............................................................ 3

STANDARD OF REVIEW ................................................................. 6

ARGUMENT ...................................................................................... 7

I.      COMMERCE ACTED WITHIN ITS DISCRETION IN ISSUING A QUESTIONNAIRE IN LIEU OF ON-SITE VERIFICATION ........................................................................ 7

II.     COMMERCE'S APPLICATION OF AFA IN DETERMINING TEKNIK'S SUBSIDY RATE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW BECAUSE TEKNIK FAILED TO PROVIDE SOURCE DOCUMENTATION VERIFYING ITS SUBMISSIONS ........................................................... 14

III.    COMMERCE'S APPLICATION OF AFA TO TEKNIK'S SALES RECONCILIATION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ....................................................................... 25

CONCLUSION ................................................................................... 30

i

NONCONFIDENTIAL
VERSION

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*ArcelorMittal USA LLC v. United States*,
    337 F. Supp. 3d 1285 (Ct. Int'l Tr. 2018)......................................18-19

*ArcelorMittal USA LLC v. United States*,
    399 F. Supp. 3d 1271 (Ct. Int'l Tr. 2019)...............................................9

*BlackLight Power, Inc. v. Rogan*,
    295 F.3d 1269 (Fed. Cir. 2002) .............................................................8

*Borusan Mannesmann Boru Sanayi ve Ticaret*
    *v. United States*,
    61 F. Supp. 3d 1306 (Ct. Int'l Tr. 2012)...........................................9-10

*Bowe-Passat v. United States*,
    17 C.I.T. 335 (1993) ........................................................................11-12

*Carpenter Tech. Corp. v. United States*,
    344 F. Supp. 2d 750 (Ct. Int'l Tr. 2004)...............................................29

*Carpenter Tech. Corp. v. United States*,
    510 F.3d 1370 (Fed. Cir. 2007) ...........................................................29

*Changzhou Trina Solar Energy Co. v. United States*,
    161 F. Supp. 3d 1343 (Ct. Int'l Trade 2016)...................................27-28

*Fujian Machinery & Equip. Imp. & Exp. Corp.*
    *v. United States*,
    25 C.I.T. 1150, 178 F. Supp. 2d 1305 (2001) .................................11-12

*Gulf States Tube Div. of Quanex Corp. v. United States*,
    21 C.I.T. 1013, 981 F. Supp. 630 (1997) ..............................................27

NONCONFIDENTIAL
VERSION

*Hubbell Power Sys. v. United States*,
   CIT 15-00312, Slip Op. 19-145,
   2019 Ct. Intl. Trade LEXIS 146 (Nov 20, 2019),
   *appeal dismissed*, Appeal No. 20-1372
   (Fed. Cir. Feb. 7, 2020) ........................................................................ 24

*Hung Vuong Corp. v. United States*,
   483 F. Supp. 3d 1321 (Ct. Int'l Tr. 2020) ........................... 7, 18, 19, 22

*Hyundai Steel Co. v. United States*,
   279 F. Supp. 3d 1349 (Ct. Int'l Tr. 2017) ..................................... 29, 30

*Hyundai Heavy Indus. v. United States*,
   399 F. Supp. 3d 1305 (Ct. Int'l Trade 2019), *aff'd without
   op.,* 819 Fed. Appx. 937 (Fed. Cir. 2020) ........................................... 23

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States,*
   273 F. Supp. 3d 1225 (Ct. Int'l Tr. 2017) ............................................. 9

*Taian Ziyang Food Co. v. United States*,
   33 C.I.T. 828, 637 F. Supp. 2d 1093 (2009) ....................................... 24

*Yantai Timken Co. v. United States*,
   521 F. Supp. 2d 1356 (Ct. Int'l Tr. 2007) ..................................... 19-21

## Statutes and Regulations

19 U.S.C. § 1677e(a)(2)(A), (B), and (D) ........................................... 24-25

19 C.F.R. § 351.307 ................................................................................ 7

19 C.F.R. § 351.307(d) ....................................................................... 9, 14

NONCONFIDENTIAL
VERSION

## Administrative Determinations

*Common Alloy Aluminum Sheet From Bahrain, India, and*
   *the Republic of Turkey: Countervailing Duty Orders,*
   86 Fed. Reg. 22,144 (Dep't Commerce Apr. 27, 2021)
   (P.R. 352, Appx1112-1114) ................................................................ 2

*Common Alloy Aluminum Sheet from the Republic of Turkey:*
   *Final Affirmative Countervailing Duty Determination and*
   *Final Affirmative Determination of Critical*
   *Circumstances, in Part*, 86 Fed. Reg. 13,315 (Mar. 8, 2021)
   ("*Final Determination*") (P.R. 344, Appx1108-1111) ................. *passim*

*Issues and Decision Memorandum for the Final*
   *Determination in the Countervailing Duty Investigation of*
   *Common Alloy Aluminum Sheet from the Republic of*
   *Turkey* (Dep't Commerce Mar. 1, 2021) ("*IDM*")
   (P.R. 341, Appx1062-1107) ................................................ 2, 8, 24-25

*Issues and Decision Memorandum for the Final Results of*
   *the Countervailing Duty Administrative Review of*
   *Common Alloy Aluminum Sheet from the People's*
   *Republic of China; 2018-2019* (Dep't Commerce
   Dec. 17, 2021), *ref'd in* 86 Fed. Reg. 72,927 (Dec. 23, 2021) ......... 22-23

## Miscellaneous

Merriam-Webster Online Dictionary,
   https://www.merriam-webster.com/dictionary/screenshot
   (last visited Feb. 1, 2022) .................................................................... 15

**NONCONFIDENTIAL
VERSION**

## <u>Glossary</u>

| Acronym | Item |
|---------|------|
| AFA | Adverse Facts Available |
| IDM | *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Common Alloy Aluminum Sheet from the Republic of Turkey* <br> (Dep't of Commerce Mar. 1, 2021) |
| QR | Questionnaire Response |

**NONCONFIDENTIAL
VERSION**

Pursuant to Rule 56.2 of the Rules of the United States Court of
International Trade and the Court's September 9, 2021 Scheduling
Order (ECF #24), Defendant-Intervenors The Aluminum Association
Common Alloy Aluminum Sheet Working Group and its individual
members, Aleris Rolled Products, Inc., Arconic, Inc., Constellium Rolled
Products Ravenswood, LLC, JW Aluminum Company, Novelis
Corporation, and Texarkana Aluminum, Inc. ("Defendant-Intervenors")
file this brief in response to Plaintiff Teknik Aluminyum Sanayi A.S.
(Teknik)'s Motion for Judgment on the Agency Record (ECF #25) and
Memorandum in Support (ECF #25-1) ("Teknik Br.").

## RULE 56.2 STATEMENT

1. The administrative determination challenged by Teknik is
   *Common Alloy Aluminum Sheet from the Republic of Turkey:
   Final Affirmative Countervailing Duty Determination and Final
   Affirmative Determination of Critical Circumstances, in Part*, 86
   Fed. Reg. 13,315 (Mar. 8, 2021) (hereinafter, "*Final
   Determination*") (P.R. 344, Appx1108-1111),[1] and the United

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to
the record of the underlying investigation.

NONCONFIDENTIAL
VERSION

States Department of Commerce's ("Commerce" or the

"Department") accompanying issues and decision memorandum,

*Issues and Decision Memorandum for the Final Determination in*

*the Countervailing Duty Investigation of Common Alloy Aluminum*

*Sheet from the Republic of Turkey* (Dep't Commerce Mar. 1, 2021)

(hereinafter, "IDM") (P.R. 341, Appx1062-1107) and order,

*Common Alloy Aluminum Sheet From Bahrain, India, and the*

*Republic of Turkey: Countervailing Duty Orders*, 86 Fed. Reg.

22,144 (Dep't Commerce Apr. 27, 2021) (hereinafter, "Order") (P.R.

352, Appx1112-1114).

2. The issues presented for the Court's determination are:

    a.    Whether the Department acted within its discretion in

        issuing a questionnaire in lieu of onsite verification of

        factual information submitted to the agency by Teknik

        during the administrative proceedings;

    b.    Whether the Department's application of adverse facts

        available ("AFA") in determining Teknik's subsidy rate was

NONCONFIDENTIAL
VERSION

in accordance with law and supported by substantial

evidence;

c.   Whether the Department's application of AFA to Teknik's

sales reconciliation was in accordance with law and

supported by substantial evidence.

## SUMMARY OF ARGUMENT

Teknik's challenges to Commerce's application of AFA fail for several

reasons.[2]

First, Commerce's issuance of a questionnaire in lieu of onsite

verification, its request for screenshots of Teknik's accounting systems

as source documentation to verify Teknik's submissions and

reconciliations, and the Department's refusal to allow Teknik a second

chance to submit requested source documentation, were all a proper

exercise of the Department's broad discretion to conduct verification of

the factual information submitted by Teknik to the Department during

the administrative proceedings. Given the COVID-19 pandemic,

Commerce was not in a position to conduct onsite verifications in this or

---

[2] In an attempt to avoid duplication of arguments, Defendant-Intervenors refer to and adopt by reference herein the arguments made in the response brief filed by Defendant the United States.

other proceedings, and the agency properly issued a questionnaire in lieu of an onsite verification as a result of these challenges. Teknik's complaint that the questionnaire in lieu of onsite verification prejudiced Teknik because it was deprived of a "collaborative" process with Commerce is contrary to the reality of an onsite verification, which is an intense and invasive process for respondents. Moreover, Commerce was not required to provide Teknik with multiple opportunities to submit the screenshots Commerce requested repeatedly throughout the questionnaire as source documentation needed to verify Teknik's responses and sales reconciliations.

Second, Commerce acted lawfully in finding the four government benefit programs countervailable based on AFA. Teknik's failure to submit a screenshot of the account in which all subsidies from the Government of Turkey would have been received rendered it impossible for Commerce to verify Teknik's reported benefits. In a remote verification such as this, screenshots – *i.e.*, screen grabs capturing images or pictures of Teknik's accounting system as it appeared on Teknik's computers – were the closest thing Commerce had to source

NONCONFIDENTIAL
VERSION

documents needed to substantiate Teknik's submissions. Teknik claims the account data provided (*i.e.*, Exhibit V-14 to Teknik's questionnaire response) was a printout of a ledger "downloaded" from its system, but without screenshots of relevant information as recorded and stored in Teknik's electronic recordkeeping system, Commerce had no way to verify whether Exhibit V-14 accurately or completely reported all government benefits received. Teknik acted purposefully in failing to provide the screenshots requested, and accordingly failed to cooperate to the best of its ability with Commerce's explicit verification instructions.

Third, Commerce acted lawfully in rejecting Teknik's sales reconciliation. Teknik admitted to the Department that it had only verified the starting figure of its sales reconciliation, and further admitted all adjustments in its reconciliation were "not accounted for in the financial system" and, therefore, that no supporting documentation could be provided. Teknik entirely fails to address this missing documentation in its brief to the Court. Instead, Teknik argues that because it submitted the same sales reconciliation in Commerce's

**NONCONFIDENTIAL
VERSION**

concurrent antidumping investigation, Commerce's rejection of the sales reconciliation in the countervailing investigation was arbitrary and capricious. The analysis Commerce conducts in an antidumping investigation, however, is distinct from its analysis in a countervailing duty investigation, and the record from the antidumping investigation is not before the Court here. Moreover, precedent firmly establishes the independence of each investigation before the agency; no segment or separate investigation is binding on another.

Accordingly, the Department's final determination is both supported by substantial evidence and in accordance with law.

## STANDARD OF REVIEW

Defendant-Intervenors incorporate by reference the Defendant's recitation of the applicable standard of review. *See* Defendant's Response to Plaintiff's Motion for Judgment Upon the Administrative Record (hereinafter, "Def.'s Br.") (ECF #27) at 14-16.

**NONCONFIDENTIAL
VERSION**

# ARGUMENT

## I.   Commerce Acted Within Its Discretion in Issuing a Questionnaire in Lieu of On-Site Verification

Teknik challenges Commerce's questionnaire in lieu of on-site verification, arguing Commerce should have but failed to (1) request any information missing from Teknik's verification documentation, *see* Teknik Br. at 21-27; and (2) issue a verification report pursuant to 19 C.F.R. § 351.307. *Id.* at 28-29. As discussed below, neither contention has merit.

Commerce acted well within its discretion in issuing a questionnaire in lieu of on-site verification. *See* Defendant's Response to Plaintiff's Motion for Judgment Upon the Administrative Record (ECF #27) (hereinafter, "Def.'s Br.") at 16-22. "'Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.'" *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (Ct. Int'l Tr. 2020) (quoting *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Tr. 1990)). In a countervailing duty investigation, Commerce's verification must confirm the accuracy of both the company's reported sales values and the program benefits

NONCONFIDENTIAL
VERSION

received. The agency also seeks to verify, through its examination of the company's accounting records, that the company did not fail to report subsidy benefits.

Congress has delegated broad authority to Commerce to determine the manner in which it conducts verifications. *See* Def.'s Br. at 17-18. Moreover, courts have long recognized "the importance of leaving great flexibility with {federal agencies} to deal with emergency situations' in order to avoid harming that which the agency oversees." *BlackLight Power, Inc. v. Rogan*, 295 F.3d 1269, 1274 (Fed. Cir. 2002) (internal quotation omitted). In responding to the unprecedented COVID-19 pandemic, Commerce acted within the "great flexibility" bestowed upon it by Congress to operate in emergency situations by temporarily foregoing its usual on-site verification procedures, and relying instead on written questionnaires to verify respondents' submissions. *See id.*; *see also* Def.'s Br. at 17-18; IDM at 21 (P.R. 341; Appx1082).

Teknik's argument that Commerce's issuance of a questionnaire in lieu of onsite verification somehow deprived Teknik of a "collaborative" onsite verification, Teknik Br. at 21-22, misrepresents the reality of

NONCONFIDENTIAL
VERSION

onsite verifications. Typically, the Department's verification is an exacting, labor-intensive process for both the government officials involved and the respondent. Commerce officials travel to the respondent's facilities in the subject country and seek "access to all files, records, and personnel" necessary to verify factual information contained in the respondent's submissions. 19 C.F.R. § 351.307(d). Often, Commerce's in-person audit uncovers reporting errors and/or subsidy information the respondent failed to report. *See, e.g., ArcelorMittal USA LLC v. United States*, 399 F. Supp. 3d 1271, 1274 (Ct. Int'l Tr. 2019) (Commerce officials discovered at verification that respondent had used an income tax deduction for mining expenses that it had not reported); *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1235 (Ct. Int'l Tr. 2017) (Commerce officials discovered at verification respondent "was eligible for, and did receive" an unreported subsidy). The verification process frequently take multiple days, and in some cases over a week. *See, e.g., Borusan Mannesmann Boru Sanayi ve Ticaret v. United States*, 61 F. Supp. 3d 1306, 1313 (Ct. Int'l Tr. 2012) (noting Commerce's onsite verification of

-9-

Turkish respondent and Government of Turkey lasted from April 25, 2014 to May 2, 2014).

Here, Teknik was spared the time, expense, and resources necessary to facilitate an in-person visit by Commerce officials to review Teknik's books and records.[3] Instead, all Teknik had to do was provide "screenshots" of the relevant source data substantiating the figures reported in its reconciliations and reports of sales and program benefits received – *i.e.*, pictures of information retrieved directly from Teknik's electronic record system that Commerce officials would have seen if they were physically on-site at Teknik's facilities.[4] *See generally* Letter from Sandler, Travis & Rosenberg P.A. re: Common Alloy Aluminum Sheet from Turkey: Teknik Aluminyum Sanayi A.S.'s Response to the Questionnaire in Lieu of Verification (Jan. 22, 2021) (hereinafter "Teknik Verification QR"). The burden on Teknik here was significantly less than a typical onsite verification would have been. Yet, Teknik

---

[3] Indeed, it is petitioners, not respondents, that are prejudiced by the Department's streamlined verification process because written questionnaires and responses are less likely to uncover unreported subsidies or other inconsistencies with submitted documentation.

[4] As discussed below in Section II, these screenshots constituted source documentation critical to Commerce's ability to substantiate Teknik's reported benefits and sales reconciliations.

failed to submit screenshots substantiating anything other than the *starting* value of its domestic and export sales reconciliations. *Id.* at 1-2, Exhibit V-4 – Exhibit V-5 (P.R. 320; C.R. 276, 281-282; Appx2380-2381, Appx2397-2405).[5]

Teknik has failed to cite any legal authority for the proposition that, as part of its verification, the Department was required to provide Teknik a second chance to submit source documentation that was requested explicitly and repeatedly throughout the verification questionnaire. Both *Fujian Machinery & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 178 F. Supp. 2d 1305 (2001), and *Bowe-Passat v. United States*, 17 C.I.T. 335, 339 (1993), cited by Teknik (*see* Teknik Br. at 25) are inapt. In *Fujian Machinery*, the court remanded the agency's final determination applying AFA to a respondent where Commerce "implicitly represented" to the respondent, in the final hours of on-site verification and after the respondent's U.S. counsel and

---

[5] Although Teknik indicated it provided a "screen shot from the accounting system showing the value of export sales," (*see id.* at 2 (P.R. 320; C.R. 276; Appx2381), the screen shot in Exhibit V-5 [                                                    ] *Compare* Teknik Verification QR at Exhibit V-5 (C.R. 282; Appx2405) *with id.* at Exhibit V-4 (C.R. 281; Appx2401). Teknik made no mention of [                                                    ] *See id.* at 2-4 (P.R. 320; C.R. 276; Appx2381-2383).

NONCONFIDENTIAL
VERSION

numerous employees had left for the day, "that the responses were satisfactory" – and then later declared them unsatisfactory. *Fujian Machinery*, 25 C.I.T. at 1162, 178 F. Supp. 2d at 1320. In *Bowe-Passat*, the Court remanded a final determination where the Department failed to identify deficiencies in the respondent's questionnaire response, rejected the respondent's subsequent attempt to submit the missing documentation, and then opted *not* to conduct a verification. *See Bowe-Passat*, 17 C.I.T. at 341-42.

Here, Commerce repeatedly and explicitly identified in writing the documentation required to verify Teknik's submitted data – *i.e.*, "screenshots" – and Teknik chose not to submit this documentation. Unlike the respondent in *Fujian Machinery*, Teknik was not misled into believing it had submitted the appropriate documentation, or given insufficient time to seek clarification. To the contrary, the Department granted Teknik's request for an extension of time to respond to the

verification questionnaire, providing Teknik over a week to prepare its response.[6]

At no point during that week did Teknik "contact the Commerce officials in charge of this case" to raise any questions about "whether related documents or information can be submitted." *See* Teknik Verification QR at 1 (P.R. 313; Appx2361). Accordingly, Teknik's complaint that Commerce's questionnaire in lieu of onsite verification was not "collaborative" falls flat. Commerce was not required to provide Teknik with multiple opportunities to submit the documentation Commerce clearly requested, and Teknik's argument to the contrary must fail.

Finally, Teknik's claim that the Department acted unlawfully by failing to issue a verification report, *see* Teknik Br. at 28, also misses the mark. No formal "verification report" is required by the regulations. *See* Def.'s Br. at 27-28 (citing *Stupp Corp. v. United States*, 5 F. 4th 1341 (Fed. Cir. 2021)). In any case, the Department complied with the

---

[6] *See* Memorandum from Dep't of Commerce re: "Countervailing Duty Investigation of Common Alloy Aluminum Sheet from the Republic of Turkey: Extension of Deadline for Teknik Aluminyum Sanayi A.S. to Respond to Questionnaire in Lieu of Verification" (Jan. 19, 2021) at 1 (P.R. 319; Appx2370).

NONCONFIDENTIAL
VERSION

regulation's requirements by reporting the "methods," "procedures," and "results" of its verification through the written verification process on the record. *See generally* Teknik Verification QR (P.R. 320-322; C.R. 276-279; Appx2371-2388). Any additional "verification report" would have been redundant.[7] Accordingly, the Department's questionnaire in lieu of onsite verification was both a proper exercise of the Department's discretion and in accordance with law.

## II.   Commerce's Application of AFA in Determining Teknik's Subsidy Rate Was Supported by Substantial Evidence and in Accordance with Law Because Teknik Failed to Provide Source Documentation Verifying Its Submissions

Because Teknik failed to supply the documentation requested by Commerce, and because Commerce was not required to allow Teknik a second opportunity to submit documentation verifying its submissions, Commerce's decision to apply AFA in determining Teknik's subsidy rate was lawful and a reasonable exercise of the agency's discretion.

---

[7] Indeed, the Department's modified verification procedures in light of the COVID-19 pandemic rendered moot several of Commerce's typical verification requirements, including, for instance, that the Department "will notify the government of the affected country that employees of the Department will visit with the persons listed below in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d).

As the Government discusses in its brief, Commerce properly
determined that Teknik's failure to submit screenshots of the account
represented in Exhibit V-14 of its questionnaire response – *i.e.*, account

[                    ] which Teknik asserted would show "{a}ny subsidy
income received from the Government of Turkey," Teknik Verification
QR at 6 (P.R. 320; C.R. 276; Appx2385) – prevented Commerce from
"confirm{ing} whether the reconciliation, which Teknik previously
submitted, corroborated its reported benefits and non-use of certain
programs." Def.'s Br. at 38.

Teknik argues that the Department "repeatedly and incorrectly
describes Exhibit V-14 as a 'worksheet' rather than the actual
accounting ledger utilized in Teknik's system." Teknik Br. at 36. This
argument, however, misses the point. Exhibit V-14 is clearly not a
"screenshot," and Teknik does not argue that it is. A "screenshot," as
defined by Merriam-Webster, is "an image that shows the contents of a
computer display." Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/screenshot (last visited
Feb. 1, 2022). Screenshots are typically captured using a computer's

snipping tool application. Thus, the screenshots requested by Commerce would have reproduced information recorded in Teknik's electronic records exactly as it appears in Teknik's system. Teknik describes Exhibit V-14, by contrast, as a "download{}" that Teknik printed for the Department. *See Common Alloy Aluminum Sheet from Turkey: Teknik Aluminyum Sanayi A.S.'s Rebuttal Case Brief* (Feb. 9, 2021) ("Teknik Reb. Br.") at 11 (P.R. 331, C.R. 310, Appx4920).

The distinction is crucial: A "screenshot" shows an actual picture – *i.e.*, a screen grab or a captured image – of what Commerce officials would have seen if they were standing in Teknik's facilities and looking at Teknik's accounting system on a computer screen. Examples of such screenshots are provided in Teknik's questionnaire response at Exhibit V-4 (showing Teknik's total domestic sales amount as it appears in Teknik's accounting system) and Exhibit V-15.d (showing loan balances as they appear in Teknik's accounting system). *See* Teknik Verification QR at Exhibit V-4 (C.R. 281; Appx2401), Exhibit V-15.d (C.R. 292; Appx2522). These screenshots are images – almost like a photograph –

that show the Department exactly how Teknik's accounting system appears.

Exhibit V-14, however, is not a screen grab or picture of Teknik's accounting system. *See id.* at Exhibit V-14 (C.R. 289; Appx2478-2505). It is a black and white printout of a table Teknik claims was "downloaded" from its system, but without a screenshot there is no photographic evidence proving this table is the same as it appears in Teknik's accounting system. Similarly, there is no screenshot from Teknik's accounting system showing the "Closing year end" balance of the account represented in Exhibit V-14, which would have verified at least that Exhibit V-14 was a complete restatement of all subsidy benefits received by Teknik in 2019. The record simply does not contain sufficient information for Commerce to verify whether Exhibit V-14 is a worksheet, an accurate and complete representation of "all accounts where government or subsidy income is or would be recorded," *see* Teknik Verification QR at 5-6 (P.R. 320; C.R. 276; Appx2384-2385), or something else. Moreover, Teknik admitted it *could have* submitted screenshots for information identified in the Department's

NONCONFIDENTIAL
VERSION

questionnaire in lieu of onsite verification, but chose not to do so because it decided unilaterally "that "{p}roviding multiple screen shots of a big ledger would not have presented the information in any meaningful sense." Teknik Br. at 45.

In a remote verification like Teknik's here, a screenshot of Teknik's accounting system was the closest thing Commerce had to source documentation (*i.e.*, original records) necessary to the agency's ability to audit or "verify" a respondent's submission of factual information. Indeed, this Court recently cited the Federal Circuit's holding that "Commerce is entitled to insist on the original records because 'failure to submit primary source documentation' means that Commerce is 'unable to verify the accuracy of the information submitted.'" *Hung Vuong Corp.*, 483 F. Supp. 3d at 1369 (quoting *Thyssen Stahl AG v. AK Steel Corp.*, No. 97-1509, 1998 WL 455076, at *5 (Fed. Cir. July 27, 1998)); s*ee also ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285, 1303 (Ct. Int'l Tr. 2018) ("Essentially, because the {Government of Russia} did not provide the underlying data necessary — in the form of the completed quarterly sales reports — Commerce

could not verify the consumption percentages in the annual reports, and was thus justified in applying AFA….").

In *Hung Vuong*, this Court affirmed Commerce's application of facts available to a respondent that failed to keep source documents substantiating the respondent's reported sales data and, therefore, was unable to provide these documents to the Department at verification. *Id.* at 1348-39 (citing 19 U.S.C. § 1677e(a)(2)(D)). The Court held: "Commerce sought this source document information precisely to verify Hung Vuong's responses to Commerce's initial and supplemental questionnaires. Because the discarded source documents prevented verification, Commerce permissibly applied facts otherwise available." *Id.* at 1348 (citing *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1375 (Ct. Int'l Tr. 2007)). The Court further rejected the respondent's "secondhand 'summary reports' purporting to reflect information in original source documents," because these reports were not "original records." *Id.* at 1349.

In *Yantai Timken Co.*, the court rejected a similar argument that the

plaintiff had provided sufficient documentation to verify its

questionnaire responses, stating:

> The Court finds no support in the record for
> Plaintiffs' conclusory allegations that "all
> expenses were duly reported in the response, and
> were tied to the Company's books and records"
> and that "Commerce was able to judge the
> completeness of the company's reporting because
> all of the line items for expenses were included on
> the internal reports used to calculate the reported
> expenses."

521 F. Supp. 2d at 1370 (citation omitted). The court also affirmed

Commerce's AFA determination where the respondent "supplied

information regarding rebates and commissions that could not be

verified and further failed to provide source documents requested by

Commerce." 521 F. Supp. 2d at 1375. The court noted Commerce had

advised the respondent "that it must provide 'complete supporting

documentation for each pre-selected sales transaction and each

verification procedure,'" and that required documentation would include

"selected invoices and copies of pages from sub-ledgers tracing the

reported per unit cost back to the general ledger accounts and source

NONCONFIDENTIAL
VERSION

documents." *Id.* The respondent failed to provide these documents to

Commerce during verification. The court concluded:

> Plaintiffs do not allege that they did not possess
> the requested documents. . . Worksheets provided
> by Yantai purporting to show that it made no
> payments were not tied to internal accounting
> documents. . . The record further indicates that
> Yantai did not propose any other means for
> Commerce to verify its rebates and commissions.
>
> . . .
>
> Commerce therefore reasonably determined that
> Yantai failed to cooperate to the best of its ability.

*Id.* at 1376.

Just as in *Yantai Timken Co.*, Commerce here was left only with

Teknik's bald representation that "{t}he account ledger submitted at

Exhibit V-14 contains all the transactions for the POI." Teknik

Verification QR at 6 (P.R. 320; C.R. 276; Appx2385). Moreover, the

Department could not verify that Exhibit V-14 was a *complete*

representation of account [                    ], because Teknik failed to

submit a screenshot showing the 2019 balance of this account in its

general accounting ledger. In response to the Department's instruction

to "{t}ie the totals" for this account to Teknik's year-end financial

-21-

NONCONFIDENTIAL
VERSION

statements and "{p}rovide screenshots of each step of the reconciliation,"
Teknik merely referred back to Exhibit V-14 and to a worksheet
(Exhibit V-13) that Teknik created for purposes of the Commerce
Department's investigation (*i.e.*, not in the ordinary course of its
business) to tie this account to its audited financial statements. *Id.* at 7,
Exhibit V-13 – Exhibit V-14 (P.R. 320-322; C.R. 276, 288-289;
Appx2386, Appx2476-2505).[8]

Teknik's claim that "{p}roviding multiple screen shots of a big ledger
would not have presented the information in any meaningful sense" is
simply wrong. Teknik Br. at 45. The screenshot of its accounting ledger
for account [                    ] was critical. As Commerce has explained, its
long-standing verification methods:

> are comparable to those of an auditor, attempting
> to confirm usage or claimed non-usage by
> examining books and records which can be traced
> to audited financial statements, or other official
> company documents, such as tax returns, that
> provide a credible and complete picture of a
> company's financial activity for the period under
> examination. A review of ancillary documents,

---

[8] The Department properly rejected Exhibit V-13 – a "secondhand 'summary
report,'" *Hung Vuong*, 483 F. Supp. at 1349 – as an original source document
for verifying the amounts in Exhibit V-14.

NONCONFIDENTIAL
VERSION

> such as applications, correspondence, emails, *etc.*,
> provides no assurance to Commerce that it has
> seen all relevant information.

*Issues and Decision Memorandum for the Final Results of the*

*Countervailing Duty Administrative Review of Common Alloy*

*Aluminum Sheet from the People's Republic of China; 2018-2019*, at 16-

17 (Dep't Commerce Dec. 17, 2021) (citation omitted), *ref'd in* 86 Fed.

Reg. 72,927 (Dec. 23, 2021). Here, Teknik supplied an ancillary

document (Exh. V-14) that was properly rejected by Commerce as

unverifiable, in accordance with its long-standing verification methods.

As the Government discusses in its brief, Teknik's insistence that it

did not need to provide the screenshots requested by Commerce

demonstrates Teknik's failure to cooperate to the best of its ability.

Def.'s Br. at 35, 42, 50.[9] Teknik was not confused about the

Department's documentation requirements, nor did Teknik claim it was

unable to provide the screenshots requested (indeed, it provided

---

[9] *See Hyundai Heavy Indus. v. United States*, 399 F. Supp. 3d 1305, 1313 & n.11 (Ct. Int'l Trade 2019), *aff'd without op.*, 819 Fed. Appx. 937 (Fed. Cir. 2020) (a respondent may not "selectively report the information that it deems sufficient to substantiate its reported data. It is Commerce, not the respondents, that decides what information must be provided.") (citing *e.g., POSCO v. United States,* 296 F. Supp. 3d 1320, 1341 n.31 (Ct. Int'l Trade 2018)).

NONCONFIDENTIAL
VERSION

screenshots to Commerce in connection with other requests made in the questionnaire in lieu of onsite verification). It simply refused to do so. Teknik argues it "fully cooperated throughout the underlying investigation, filing timely questionnaire responses consisting of thousands of pages of narrative and exhibits in response to Commerce's requests for information." Teknik Br. at 19. But "quantity is not a definitive indicator of cooperation." *Hubbell Power Sys. v. United States*, CIT 15-00312, Slip Op. 19-145 at 6, 2019 Ct. Intl. Trade LEXIS 146 (Nov 20, 2019), at *7-8, *appeal dismissed*, Appeal No. 20-1372 (Fed. Cir. 2020); *see also Taian Ziyang Food Co. v. United States*, 33 C.I.T. 828, 637 F. Supp. 2d 1093 (2009) ("Ziyang and FHTK seem to suggest the submission of voluminous amounts of general non-responsive data is synonymous with the submission of relevant answers specific to the question asked, which is obviously not the case.") (citing *NSK Ltd., v. United States,* 481 F.3d 1355, 1361 (Fed. Cir. 2007)).

Accordingly, Commerce's determination that Teknik failed to provide requested information, failed to submit information in the form and manner requested by Commerce, and provided information that could

NONCONFIDENTIAL
VERSION

not be verified was in accordance with law pursuant to 19 U.S.C. §

1677e(a)(2)(A), (B), and (D), and Commerce's determination that Teknik

failed to cooperate to the best of its ability, were both supported by

substantial evidence and in accordance with law. *See* IDM at 22 (P.R.

341; Appx1083).

## III.   Commerce's Application of AFA to Teknik's Sales Reconciliation Was Supported by Substantial Evidence and in Accordance with Law

Finally, Commerce's determination that it could not verify Teknik's

sales database was not arbitrary and capricious merely because, as

Teknik argues, "Commerce accepted the exact same {reconciliation}

methodology on the AD side of the case." Teknik Br. at 58.

Teknik's verification questionnaire response attempted to reconcile

its domestic sales value as recorded in its accounting system ([

]), with its domestic sales value as reported in

its audited financial statements ([                            ]). *See* Teknik

Verification QR at 1-2, Exhibit V-4 (P.R. 320; C.R. 276, 281; Appx2380-

2381, Appx2397-2401). The reconciliation included nine different steps

to reconcile the first amount with the last, including converting the

domestic sales value to U.S. dollars ("USD"); deducting "Sales to TMT

accounted as domestic sales in accounting system," which Teknik

reported as [

]; converting net domestic sales back

to Turkish lira; and deducting [                    ] for "Audit Correction in

Turkish Lira." *See id.* at Exhibit V-4.

The sole screenshot Teknik provided, however, substantiated only

the *starting* value of its reconciliation for domestic sales (*i.e.*, [

]) to its accounting system. *Id.* No screenshots were

provided for the other amounts used in the reconciliation. *See id.* For

instance, Teknik did not provide a screenshot from its accounting

system to substantiate the amount declared as Teknik's sales to TMT,

nor did Teknik offer any supporting documentation for the quarterly

average exchange rate or the "Audit Correction in Turkish Lira"

amount used in its reconciliation. *See id.*

In its rebuttal case brief filed with Commerce in the underlying

proceedings, Teknik *admitted* that the unsubstantiated amounts in the

reconciliations were "not accounted for in the financial system and,

NONCONFIDENTIAL
VERSION

therefore, no screen shots can be provided for these adjustments." *See Teknik Reb. Br.* at 6 (P.R. 331, C.R. 310, Appx4915). Now, on appeal, Teknik entirely fails to address these missing source data. Instead, Teknik makes a baseless argument that Commerce should have verified its sales reconciliation because the Department verified Teknik's sales reconciliation in the antidumping segment of this proceeding. *See* Teknik Br. at 58-61.

Teknik cites no authority for the proposition that the Department's findings in an antidumping investigation are binding on the agency's findings in a countervailing duty investigation, or vice versa. In fact, the court has held just the opposite: "{B}ecause countervailing duty laws are directed at a different type of unfair trade practice than antidumping duty laws, an antidumping proceeding is not bound by findings in a countervailing duty proceeding." *Gulf States Tube Div. of Quanex Corp. v. United States*, 21 C.I.T. 1013, 1034, 981 F. Supp. 630, 649 (1997) (citation omitted); *see also Changzhou Trina Solar Energy Co. v. United States*, 161 F. Supp. 3d 1343, 1348-49 (Ct. Int'l Trade

NONCONFIDENTIAL
VERSION

2016) ("{E}ach CVD proceeding is based on its own unique record of factual evidence and arguments presented to the agency").

Teknik argues "{t}he same documentation was provided at verification for sales reconciliation purposes" in the antidumping investigation. Teknik Br. at 60. But, as Defendant notes, "Teknik does not elaborate on how its reconciliations in the antidumping and countervailing duty proceedings are the same." Def.'s Br. at 51. In fact, the documentation for the antidumping investigation is not on the record in this case. *See Pakfood Public Co. Ltd.* v. United States, 724 F. Supp. 2d 1327, 1345 (Ct. Int'l Tr. 2010) ("Commerce makes determinations based upon the record of the relevant segment of the proceeding, not previous segments."); *see also Changzhou Trina Solar Energy Co.*, 161 F. Supp. 3d at 1349, n.28 ("'{O}nly documents and materials directly or indirectly considered by agency decision-makers become part of the administrative record {for a particular administrative proceeding}'") (quoting *Louis Dreyfus Citrus, Inc. v. United States*, 495 F. Supp. 2d 1338, 1353 (Ct. Int'l Trade 2007)) (alterations in original).

**NONCONFIDENTIAL
VERSION**

Teknik cites *Carpenter Technology Corp. v. United States*, 344 F. Supp. 2d 750 (Ct. Int'l Tr. 2004) as support for the notion that Commerce cannot arrive at a different conclusion in a subsequent administrative action where the "fact patterns {are} essentially the same." *See* Teknik Br. at 60. Teknik fails to note, however, that the court's decision in *Carpenter Technology* was subsequently overturned by the Federal Circuit. *See Carpenter Tech. Corp. v. United States*, 510 F.3d 1370 (Fed. Cir. 2007). Further, the facts and analyses are not the same in antidumping and countervailing duty cases. In any event, as the court has made clear, "'{e}ven assuming Commerce's determinations at issue are factually identical, as a matter of law a prior administrative determination is not legally binding on other reviews before this court.'" *Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1371 (Ct. Int'l Tr. 2017) (rejecting the plaintiffs' contention that, because the facts were nearly identical in a previous administrative review, Commerce acted arbitrarily by denying a constructed export price offset in one review but granting it in the other) (quoting *Alloy Piping Prods. v. United States*, 33 C.I.T. 349, 358-59, Slip Op. 2009-29 (2009)).

NONCONFIDENTIAL
VERSION

"Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." *Hyundai Steel Co.*, 279 F. Supp. 3d at 1372 (citing *Pakfood Public Co.*, 724 F. Supp. 2d at 1345). Accordingly, Teknik's argument that the Department's determination in the antidumping investigation affects the reasonableness of the Department's determination in the countervailing duty investigation must be rejected.

## CONCLUSION

For the reasons set forth herein, Defendant-Intervenors respectfully request that the Court deny Teknik's Motion for Judgment on the Administrative Record.

\*      \*      \*

**NONCONFIDENTIAL
VERSION**

Respectfully submitted,

 /s/ John M. Herrmann
John M. Herrmann
Kathleen W. Cannon
Elizabeth C. Johnson
**KELLEY DRYE & WARREN LLP**
3050 K Street N.W., Suite 400
Washington, D.C. 20007
Tel: (202) 342-8400
Fax: (202) 342-8451
jherrmann@kelleydrye.com
kcannon@kelleydrye.com
ejohnson@kelleydrye.com

Dated:  March 25, 2022

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's September 3, 2021 Order (ECF No. 24) setting the word limitation to Defendant-Intervenors' Response Brief to 7,000 words, counsel for Defendant-Intervenors The Aluminum Association Common Alloy Aluminum Sheet Working Group and its individual members, Aleris Rolled Products, Inc., Arconic, Inc., Constellium Rolled Products Ravenswood, LLC, JW Aluminum Company, Novelis Corporation, and Texarkana Aluminum, Inc. certifies that this Response Brief contains 5,257 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ John M. Herrmann
John M. Herrmann
Kathleen W. Cannon
Elizabeth C. Johnson
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  March 25, 2022